J-S44045-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANDREW DAVID GOLD | : | |
| | : | |
| Appellant | : | No. 295 EDA 2023 |

Appeal from the Judgment of Sentence Entered January 3, 2023
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0005374-2021

BEFORE:  OLSON, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:          **FILED SEPTEMBER 17, 2024**

Appellant, Andrew Gold, appeals from the judgment of sentence following his jury convictions of two counts of Possession of Telecommunication Identification Interception Devices, and one count each of Stalking — Repeatedly Committed Acts to Cause Fear, Stalking — Course of Conduct or Repeatedly Communicated to Another to Cause Fear and Harassment — Course of Conduct with No Legitimate Purpose.[1] After careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 5705(1), 2709.1(a)(1), 2709.1(a)(2) and 2709(a)(3) respectively.

The trial court accurately summarized the evidence elicited at trial:

Between approximately January 1, 2015 and October 12, 2021, Appellant repeatedly stalked the Victim at her home and over the internet. The stalking began one night in 2015 when the Victim was out with friends. N.T. 08/23/2022, p. 38. The Victim and her friends were standing on a bridge crossing the Delaware River between New Hope, Pennsylvania and Lambertville, New Jersey when Appellant, a stranger to the Victim, approached her and addressed her by name. N.T. 08/23/2022, pp. 38-39. When questioned about how he knew her, Appellant stated that they had met in Doylestown. N.T. 08/23/2022, p. 39. The Victim saw Appellant at least twice more in the Doylestown vicinity over the course of the next few months, and he approached her again during this period while she was out at a restaurant. N.T. 08/23/2022, pp. 39-40. During this encounter, the Victim told Appellant she did not know him and asked him to stop approaching her. N.T. 08/23/2022, p. 40.

In the spring of 2017, after the Victim had moved to Colorado, Appellant continued his stalking from afar. N.T. 08/23/2022, pp. 40-41. He sent the Victim numerous social media messages, primarily through Facebook, with aggressive and sometimes threatening content. N.T. 08/23/2022, pp. 43-52. He attempted to disguise his identity by posing as her uncle, Tom Nelson, and contacted her with an account under the same name. N.T. 08/23/2022, p. 44. In his messages as "Tom Nelson," Appellant mentioned his real identity multiple times, stating "what the hell did andrew even do?" "ill play andrew," "im playing andrew," "andrew did nothing that constitutes stalking," and "did andrew say anything about a death wish against u[?]" N.T. 08/23/2022, pp. 48-49, 51. See Exhibit # C-17, C-18, C-19, C-22.

Appellant returned to in-person stalking when the Victim returned to live in Pennsylvania. N.T. 08/23/2022, pp. 52-53. Throughout 2020 and 2021, the Bedminster Township Police Department received several complaints about a suspicious individual driving and walking around the Bedminster Hunt neighborhood, a housing development in the area of Elephant Road, Barnhill Road, and Saddlery Drive in Bedminster Township, Bucks County, where the Victim resided. N.T. 08/23/2022, pp. 52-54, 66-69, 84-99, 106-08, 111-17, 121-35. Appellant was seen driving his vehicle, a black Ford Fusion sedan, around the neighborhood on multiple occasions. N.T. 08/23/2022, pp. 52-54, 66-69, 84-99, 106-08,

111-17, 121-35. He was often seen sitting in his parked vehicle on the streets of the neighborhood. N.T. 08/23/2022, pp. 68, 75, 85, 112-13, 123-24, 171. Appellant's residence was located over 10 miles away in Hatfield Township, Montgomery County. N.T. 08/23/2022, p. 180; N.T. 08/24/2022, p. 133.

When approached and questioned by Bedminster Township police, Appellant often gave dubious reasons for being in the neighborhood, including that he liked going to the Dublin Dairy Queen and parking in the Bedminster Hunt neighborhood to eat it because the Dairy Queen parking lot was too busy. N.T. 08/23/2022, p. 172; Exhibit C-51, 00:19:13-00:19:53. He gave this explanation despite the fact that the Dublin Dairy Queen was 9.8 miles from his residence, and despite the fact that the Bedminster Hunt neighborhood was located in the opposite direction from his residence and was not even the closest subdivision to the Dairy Queen. N.T. 08/24/2022, pp. 47-48, 132. Appellant also attempted to justify his presence in the neighborhood as not illegal, that driving through the neighborhood was his "right," and that by stopping him, police were violating his "due process." Exhibit # C-9, 00:01:13-00:01:27; Exhibit # C-44, 00:00:47-00:00:53.

Appellant's suspicious and disturbing conduct went well beyond driving around and sitting in his vehicle. He was observed using binoculars to look into houses, and he was seen using a listening device pointed in the direction of the Victim's home while seated in his vehicle on Barnhill Road. N.T. 08/23/2022, pp. 68, 91-93. This activity was repeatedly reported to police by neighborhood residents. N.T. 08/23/2022, pp. 52-54, 66-69, 84-99, 106-08, 111-17, 121-35. Appellant claimed to police that he did not know anyone who resided in the neighborhood. Exhibit # C-51, 00:08:10-00:08:28.

Between January 2021 and April 2021, Appellant's activity was recorded on a neighborhood resident's Ring doorbell camera. N.T. 08/23/2022, pp. 74-83. The footage showed Appellant's vehicle driving around Saddlery Drive, repeatedly parking in the wrong direction, and driving with his headlights off. N.T. 08/23/2022, p. 75; N.T. 08/24/2022, p. 183. An open grassy area separated the Ring doorbell camera owner's residence from the Victim's house, which was viewable from that location. N.T. 08/23/2022, p. 73; N.T. 08/24/2022, p. 181. In September 2021, Appellant was observed by a neighborhood resident walking his dog in between

trees and loitering around the entrance sign for the neighborhood. N.T. 08/23/2022, pp. 123-24.

During the late summer and fall of 2021, Appellant's conduct escalated. It was during this period of time that Appellant was observed traveling around the Victim's neighborhood more frequently. N.T. 08/23/2022, pp. 84-99, 106-08, 111-17, 120-35, 132- 33. Appellant was also seen during this time using a listening device around the Victim's house and, once again, walking his dog in between trees in her neighborhood. N.T. 08/23/2022, pp. 85-93, 123-24. It was also during this period of time that Appellant purchased a handgun and ammunition. N.T. 08/24/2022, pp. 27-29.

On October 11, 2021, Appellant was reported by a neighborhood resident for driving through the neighborhood once again. N.T. 08/23/2022, p. 129. On the same day, a different neighborhood resident called in another complaint about Appellant, who he reported as circling the neighborhood and driving through alleyways behind homes. N.T. 08/23/2022, pp. 137-145. While on the call, the resident reported that Appellant was exiting his vehicle to approach him. N.T. 08/23/2022, pp. 139-142. Simultaneously, Appellant called the police to report that same resident for following him. N.T. 08/24/2022, pp. 38-39.

After these dueling complaints were made, Appellant provided a verbal and written statement to Corporal Mark Thompson at the Bedminster Township police department headquarters that afternoon. N.T. 08/24/2022, p. 40. Appellant drew a map of the neighborhood to aid in his explanation. N.T. 08124/2022, pp. 43, 46; Exhibit # C-52. When questioned, Appellant explained that he had been in the neighborhood twice that day after getting Dairy Queen and claimed that he may have been followed because he had been the subject of several public nuisance complaints by neighborhood residents. N.T. 08/24/2022, pp. 47; Exhibit # C-51, 00:06:20-00:06:40, 00:07:16-00:07:48.

When Corporal Thompson told Appellant that his conduct was scaring the Victim and her mother, Appellant initially denied knowing them, but then asked the corporal when they had last reported him to police. Exhibit # C-51, 00:10:07-00:10:15. Additionally, in explaining where he parked after getting Dairy Queen, Appellant pointed to an area on the hand-drawn map that corresponded to where the Victim's residence was located. N.T. 08/24/2022, p. 46. When Corporal Thompson noted this

"coincidence," Appellant tried to provide innocuous reasons for why he had pointed to that location. Exhibit # C-51, 00:12:17-00:13:00. Around 7:30 p.m., Appellant confirmed that would be leaving the area after exiting the police station. Exhibit # C-51, 00:29:55-00:30:13.

Approximately six minutes later, a neighborhood resident called Bedminster Township police to report Appellant driving around the neighborhood yet again. N.T. 08/24/2022, p. 42. The next day, October 12, 2021, Bedminster Township police took Appellant into custody pursuant to a valid arrest warrant—but only after observing Appellant driving around the Victim's neighborhood one last time. N.T. 08/24/2022, pp. 75-78.

Pursuant to a search warrant issued subsequent to Defendant's arrest, law enforcement officers conducted a search of Appellant's vehicle. N.T. 08/24/2022, pp. 161- 62. As a result of the search, officers recovered various items from the vehicle, including binoculars, a flashlight, a headlamp, a listening device, a box of ammunition, and a loaded handgun. N.T. 08/24/2022, pp. 162-75.

Trial Court Opinion, 2-7.

In addition to the above-recited evidence, the Commonwealth presented the results of a forensic analysis of three computers discovered pursuant to a search warrant for Appellant's home. It showed that, starting in 2015, there were 5,486 "artifacts," – that is, the results of internet searches on Google or social media including a specific term, which total reflects each computer page of results the user looked through and each website the user visited – relating to the victim's name and people and places associated with her. N.T. 8/23/22, 184-221.

Appellant was charged with two counts of Possession of Telecommunication Identification Interception Devices; one count of Stalking — Repeatedly Committed Acts to Cause Fear; one count of Stalking — Course

of Conduct or Repeatedly Communicated to Another to Cause Fear; and one count of Harassment — Course of Conduct with No Legitimate Purpose, a summary offense. Following a lengthy pre-trial hearing addressing multiple motions by Appellant to exclude evidence, a four-day jury trial took place commencing on August 22, 2022. On August 25, 2022, the jury returned a verdict finding Appellant guilty on all counts. Sentencing was deferred to allow for the completion of a Pre-Sentence Investigation Report. On January 3, 2023, the trial court imposed an aggregate term of incarceration of one year, less one day, to two years, less one day, to be followed by 12 years' probation.[2] The court also imposed special conditions of parole and probation.

Appellant filed a Notice of Appeal on January 20, 2023.

This single issue raised by Appellant is:

Did the trial court err in admitting evidence of a firearm and ammunition possessed by Appellant at the time of his arrest as such evidence was irrelevant, cumulative, and highly prejudicial?

Appellant's Brief, 10.

_____

[2] On the two counts of possessing a telecommunication interception device, felonies of the third degree, the court imposed concurrent terms of incarceration in county prison of one year minus one day to two years minus one day, and five years' consecutive probation. On the count of stalking by repeatedly committing acts to cause fear or emotional distress, a misdemeanor of the first degree, the court imposed a term of two years' probation to be served consecutively to the terms of probation on counts one and two. On the count of stalking by course of conduct to cause fear or emotional distress, a misdemeanor of the first degree, the court imposed a term of five years' probation to be served consecutively to the term of probation on count three. On the count of harassment by course of conduct, the court imposed no further penalty.

Appellant asked the trial court to exclude the evidence that he was in possession of a loaded revolver and additional ammunition at the time of his arrest in a pre-trial motion in limine on the grounds that the firearm was legally possessed, unrelated to the case "and highly prejudicial." *See* N.T. 8/22/22, 4-5. The Commonwealth explained that it was the timing of the purchase of the firearm on August 20, 2021, and that Appellant kept the gun in the car while stalking the victim, which made the firearm relevant to the case because it corresponded to an intensification of his stalking conduct and thereby was probative of his intent to either put the victim in emotional distress or fear of bodily injury. *Id*., 4-7. Finding that there were inferences that could be drawn probative of Appellant's intent, the trial court denied Appellant's motion without prejudice to him asking for reconsideration once the evidentiary record was clear. *Id*., 8.

When the Commonwealth introduced evidence that Appellant had purchased a .22 caliber revolver on August 20, 2021, Appellant objected on the grounds previously raised. N.T. 8/24/22, 26-29. On cross-examination of that witness, Appellant elicited that he had obtained a concealed carry permit and introduced the permit. *Id*., 30-31; Ex. D-2.

Corporal Nicholas Virnelson of the Bedminster Township Police Department who had led the investigation into Appellant's stalking of the victim was the final witness at trial. N.T. 8/24/22, 115-121. During a break in the testimony, before the Corporal testified about the firearm, Appellant renewed his objection to admission of the gun, raising the same arguments

- 7 -

he had raised prior to trial in that he was legally in possession of the firearm, had not brandished it and so no connection to the charged crimes had been established. *Id*., 144. Stating that nothing at trial had changed its mind that the gun was one piece of evidence probative of Appellant's intent to cause emotional distress or threaten bodily injury, the trial court denied the motion. *Id*. 145-146. It noted though that the firearm should not be highlighted. *Id*., 146. The Commonwealth assured the court that it would not introduce the physical gun but would only show the jury a photograph of the firearm along with photographs of the other items found in Appellant's car, a listening device, binoculars and duct tape. *Id*., 146-147. Corporal Virnelson then testified about the discovery pursuant to search warrants, of the dated purchase receipt for the firearm and registration form in Appellant's home and the box of ammunition under the front passenger seat and the loaded .22 caliber firearm in the glove box of Appellant's car. *Id*., 159-160, 169-170.[3]

Appellant argues on appeal that the firearms evidence was not relevant to the charges against him, which did not include a firearms offense. He also argues in the alternative that if the evidence was relevant, "any probative

_____

[3] In addition, Appellant objected to the Commonwealth's summation on the ground that the prosecutor twice mentioned the gun in closing even though a violent act was not charged. That objection was overruled. N.T. 8/25/22, 86. Appellant also objected on the ground that the Commonwealth should not have mentioned the gun at all in closing. The Commonwealth explained there had been no prohibition on doing so and the gun was mentioned along with the other items found at the same time and introduced into evidence. The objection was overruled. *Id*., 92-93.

value of the gun is greatly outweighed by the danger of unfair prejudice." Appellant's Brief, 19. We address each argument in turn.

Generally, "[q]uestions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the court's decision on such a question absent a clear abuse of discretion." **Commonwealth v. Crosley**, 180 A.3d 761, 768 (Pa. Super. 2018) (citation omitted). In addition, "[w]hen ruling on a trial court's decision to grant or deny a motion *in limine*, we apply an evidentiary abuse of discretion standard of review." **Commonwealth v. Hutchison**, 164 A.3d 494, 500 (Pa. Super. 2017) (quotations and citations omitted). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias or ill-will, or such lack of support so as to be clearly erroneous." **Crosley**, 180 A.3d at 768; **Commonwealth v. Cook**, 231 A.3d 913, 919 (Pa. Super. 2020) (similar). **See also Commonwealth v. DiStefano**, 265 A.3d 290, 297 (Pa. 2021) (appellant cannot meet heavy burden of establishing abuse of discretion by simply persuading appellate court that it may have reached different conclusion than trial court).

"All relevant evidence is admissible, except as otherwise provided by law." Pa.R.E. 402. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Pa.R.E. 401(a), (b); **Commonwealth v. Yale**, 249 A.3d 1001, 1022 (Pa. 2021). **See also Commonwealth v. Reid**, 811 A.2d 530, 550 (Pa. 2002)

("Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact").

Among the charges against Appellant were two distinct counts of stalking. Both required the Commonwealth to prove "circumstances which demonstrate" Appellant's intent either "to place [the victim] in reasonable fear of bodily injury or to cause substantial emotional distress to [the victim]." 18 Pa.C.S § 2709.1(a)(1) & (a)(2). "Stalking requires a repetitive course of malevolent conduct, the intent of which was to place someone in fear of bodily injury or cause substantial emotional distress." **Commonwealth v. D'Collanfield**, 805 A.2d 1244, 1249 (Pa. Super. 2002). Further, the statute defines "emotional distress" as "[a] temporary or permanent state of mental anguish." 18 Pa.C.S. § 2709.1(f).

Intent to cause substantial emotional distress "may be inferred from the words or actions of the defendant in light of all attendant circumstances." **D'Collanfield**, 805 A.2d at 1249. Indeed, Appellant's intent was the primary issue at trial, as there was no doubt that he engaged in the requisite course of conduct. This was echoed by both the defense and prosecution in their respective summations. **See** N.T. 8/25/22, 42-43 (defense closing argument: "this case is about intent. What was his intent? … What did he think he was doing") & 60 (prosecution closing argument: "I'd submit to you that intent is very important in this case. Certainly [defense counsel] argued that to you. … that's really at the crux of this case. Did [Appellant] intend this?"). Therefore, any evidence probative of Appellant's intent to place the victim in reasonable

- 10 -

fear of bodily injury or to cause her substantial emotional distress was relevant. ***See Commonwealth v. Hawk***, 709 A.2d 373, 376 (Pa. 1996) ("Evidence that merely *advances an inference* of a material fact may be admissible, even where the inference to be drawn stems only from human experience") (emphasis in original).

The trial court explained its rulings admitting the evidence as follows:

During the August 22, 2022 pre-trial hearing, this Court found that the Commonwealth was permitted to introduce evidence that a loaded handgun and a box of ammunition were recovered from Appellant's vehicle following his arrest on October 12, 2021. N.T. 08/22/2022, p. 8-9. We reasoned that the evidence of the gun and ammunition, in combination with the duct tape, listening device, and history of threatening words and behavior, was relevant for the purpose of showing Appellant's intent to place the Victim in reasonable fear of bodily injury and to cause her emotional distress. N.T. 08/22/2022, p. 8-9. This decision was based in part on the Commonwealth's indication that it would not seek to overemphasize the weapon and ammunition; that is, the Commonwealth agreed not to introduce the physical gun into evidence, but rather, only to introduce photographs of the gun and the ammunition. N.T. 08/22/2022, p. 7-8. After argument at the pre-trial hearing, this Court denied Appellant's Motion in Limine without prejudice and reserved the right to reconsider the Motion once a greater evidentiary predicate were to be established. N.T. 08/22/2022, p. 9.

On August 24, 2022, during trial, Appellant renewed his objection to the introduction of evidence related to the gun. N.T. 08/24/2022, p. 144. Once again, this Court denied Appellant's objection, finding that the evidentiary record clearly established as of that point in the trial that the gun and ammunition were relevant for the purposes of proving his intent. N.T. 08/24/2022, pp. 145-46. Again, this decision was based in part on the Commonwealth's agreement that only photographs of the recovered gun and ammunition would be shown to the jury, rather than the physical evidence itself. N.T. 08/24/2022, p. 146.

Trial Court Opinion, 11-12. We agree with the trial court's ruling that the fact that Appellant purchased a firearm at the time his stalking behavior escalated and that he carried it in his car along with a listening device, binoculars (both of which he was seen using) and duct tape was probative of his intent to place the victim in reasonable fear of bodily injury or to cause her substantial emotional distress. As one piece of evidence supporting an inference of a required element of a charge, the firearm was plainly relevant.

Appellant argues the firearm was not relevant because "the evidence at trial made clear that [he] had not had any physical contact with the complaining witness for several years prior to his arrest." Appellant's Brief, 19. Indeed, the trial evidence demonstrated Appellant did not have physical contact with the victim for several years, despite stalking her in her neighborhood, nonetheless his conclusion misses the point of the court's ruling. It was the timing of the purchase that made the firearm relevant. Appellant purchased the gun on August 20, 2021, less than three months before his arrest, and during a period where he ramped up the intrusiveness of his conduct. In 2020 through late April 2021, Appellant was content to park late at night on the victim's street where he could see the lights in her house or across a busier street where he could look through her windows using binoculars. N.T. 8/23/24, 67-70, 71-83; N.T. 8/24/24, 139-140, 171-172. Starting in July of 2021, Appellant was frequently seen in the area, driving slowly, following residents, and using a listening device pointed in the direction of the victim's home, while still possessing the binoculars. N.T. 8/23/24, 85-

98, 103-105, 111-117, 119-134, 136-148, 147-157, 162-166, 173-176; N.T. 8/24/22, 12-15, 22-25, 28-40. Appellant's frequent visits to the area in September and October 2021, also were captured by a pole camera and a GPS tracking device, 63-78, 80-114, 136-138.

During this period of increased activity, on August 20, 2021, Appellant purchased the .22 caliber firearm that he kept loaded in easy reach in his car along with the duct tape and other equipment he used to stalk the victim. N.T. 8/24/22, 159-160, 165-173; Ex. C-75. Collectively, these items were probative of Appellant's intent to cause the victim to fear bodily injury or cause her substantial emotional distress. Appellant kept then within easy reach in the car he used to stalk her. Two items were definitively used by him to invade the victim's privacy. All of the items taken together were suggestive of an intensification of his conduct. Combined with his knowledge that the police knew he was stalking the victim and had warned him to stop doing so, and that his conduct was of concern to the neighbors, Appellant's uncurtailed – in fact increasing – stalking behavior along with possession of these items permitted an inference of his intent to cause the victim emotional distress.

Appellant discusses two decisions in support of his argument that lawful possession of the firearm and ammunition was not relevant. Appellant's Brief, 15-18. We find these cases instead support the trial court's ruling. In the first, the Pennsylvania Supreme Court held that evidence the accused received welfare benefits was inadmissible to prove his "motive" in a prosecution for burglary. *See Commonwealth v. Haight*, 525 A.2d 1199, 1200 (Pa. 1987).

"Testimony of income … does not tend to prove or disprove any of the facts needed to establish the crime of burglary[.]" **Id**. Haight's motive for committing burglary was not relevant because it was not an element of burglary and did not make it more or less likely that he had committed the crime charged.[4] In contrast, Appellant's intent was a necessary element of both stalking counts with which he was charged. Bringing a loaded firearm with him along with other items to invade the victim's privacy and cause her emotional distress is probative of that intent.

In **Commonwealth v. Knupp**, 290 A.3d 759, 776-777 (Pa. Super. 2023), this Court held that the presence of ammunition in proximity to narcotics and drug paraphernalia was relevant to a charge of possession of a controlled substance with intent to deliver, even though no firearms offense was charged. Appellant argues that the firearms evidence was made relevant by the expert testimony also introduced in **Knupp**, and therefore the lack of expert testimony here renders the firearm and ammunition evidence irrelevant. **See** Appellant's Brief, 17-18. To the contrary, this Court did not

_____

[4] The concurring opinion in **Haight** explained this further: "Undoubtedly a lack of money is logically connected with a crime involving financial gain. The trouble is that it would prove too much against too many." **Id.,** 525 A.2d at 1201 (Papadakos, J., concurring). Evidence of specific debts, however, may be introduced where the jury may clearly draw an inference that the financial difficulties of the accused were material to his motive or state of mind in committing a crime, and evidence of the debt was not intended to stigmatize the accused's economic status. **See Commonwealth v. Brown**, 911 A.2d 576, 584 (Pa. Super. 2006); **Commonwealth v. Wax**, 571 A.2d 386, 389 (Pa. Super. 1990).

require expert testimony to admit firearms evidence in a criminal case where no firearms offense was charged.

Rather, expert evidence was admissible in *Knupp*, because, among other requirements, the specialized knowledge would "help the trier of fact to understand the evidence or to determine a fact in issue." Pa.R.E. 702(b).[5] Whether ammunition found in near proximity to narcotics is indicative of an intent to distribute the narcotics in question is not a matter within the common experience of a lay jury. The expert explicitly referred to the ammunition and, along with other factors, explained its connection to an intent to distribute narcotics. *Knupp*, 290 A.3d at 775. Here, an expert was unnecessary. The intent to cause the victim emotional distress is well within the ken of a lay jury to understand, as is the relation of a loaded firearm possessed by the accused to that intent. Thus, *Knupp* supports the trial court's ruling that the firearms evidence was relevant, even though there was no firearms offense charged. It was one piece among many circumstances from which the jury could infer Appellant's intent. *See Commonwealth v. Hall*, 830 A.2d 537, 542 (Pa. 2003) (an accused's intent "may be proven by direct or circumstantial evidence").

Appellant also argues that the evidence of his lawful possession of a firearm should have been excluded because the probative value "was greatly outweighed by the danger of unfair prejudice." Appellant's Brief, 20. A trial

_____

[5] *See Commonwealth v. Maconeghy*, 171 A.3d 707, 712 (Pa. 2017) (summarizing Rule 702's demands).

"court may exclude relevant evidence if its probative value is outweighed by a danger of … unfair prejudice." Pa.R.E. 403. "Unfair prejudice," in the context of applying Rule 403, means "a tendency to suggest decision on an improper basis to divert the jury's attention away from its duty of weighing the evidence impartially." *Commonwealth v. Kane*, 188 A.3d 1217, 1228 (Pa. Super. 2018) (citation omitted). *See also* Pa.R.E. 403, cmt. Evidence "will not be prohibited merely because it is harmful to the defendant. [E]xclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision upon something other than the legal propositions relevant to the case." *Commonwealth v. Kouma*, 53 A.3d 760, 770 (Pa. Super. 2012) (citation omitted; brackets in original). *See Knupp*, 290 A.3d at 776; *Commonwealth v. Broaster*, 863 A.2d 588, 592 (Pa. Super. 2004).

Appellant explains his theory of undue prejudice in only the most general terms. He posits that "[s]ome [people] would be inflamed by [his] mere possession of a weapon and the potential prejudice from the admission of this evidence is great." Appellant's Brief, 28. He also argues that "[i]n today's society, gun violence is considered by many to be an epidemic. Many have very strong views regarding the possession of guns and ammunition." *Id*. Notably, Appellant did not make these assertions before the trial court – he only asserted prejudice generally – and even now fails to link them to any

evidence adduced at trial.[6] This general concern about what "some" or even "many" people may think about lawfully possessed handguns could have been addressed during *voir dire*, as the trial court explicitly permitted the defense to do when ruling on the motion in limine. N.T. 8/22/22, 9-11.

When viewed in the entirety of this record, moreover, we agree with the trial court that there was no undue prejudice. Trial Court Opinion, 14-15. First, the trial court limited the presentation of the firearm evidence to photographs, ensured that the photographs would not enlarge the relative size of the gun, and the firearms evidence would not be "highlighted." N.T. 8/22/22, 7-9; N.T. 8/24/22, 146-148; Trial Court Opinion, 11. Second, contrary to Appellant's argument, the Commonwealth did not overemphasize the firearm evidence. **See** Appellant's Brief, 20. The items found in Appellant's home and car were presented together. There was no undue emphasis on the firearm and ammunition. The listening device and headphones found pursuant to the

---

[6] Before the trial court, Appellant argued, without any specificity, "there are a lot of gun issues out there. That's introducing a whole very sensitive element to the case." N.T. 8/22/22, 9. Not only was Appellant's argument vague, it may also have been incorrect as a matter of law, as an accused cannot simply assume undue prejudice from evidence that he *lawfully* possessed a handgun. **Cf. Commonwealth v. Hicks**, 208 A.3d 916, 936 (Pa. 2019) (a police officer may not infer criminal activity, of a kind supporting an investigative detention, merely from an individual's possession of a concealed firearm in public, given that such possession may be lawful if the individual has a license to do so). Moreover, the victim testified that she purchased a firearm when she found out Appellant was still stalking her in 2020. N.T. 8/23/22, 57. Any prejudice to Appellant from the evidence he lawfully purchased a firearm, therefore, would logically have been lessened by the fact the victim also bought a firearm.

- 17 -

search warrant for Appellant's home, and the pair of binoculars, listening device and headphones, roll of duct tape and two flashlights found pursuant to the search warrant for Appellant's car were brought to the courtroom, shown to the jury and admitted into evidence. *Id*., 171-174; Ex. C-104, C-105, C-106, C-108. The firearm and ammunition found in the car with the other items were shown to the jury by photographs only. *Id*., 169-170; Ex. C-100, C-101, C-102, C-103. The Commonwealth also introduced documentary and testimonial evidence concerning the timing of Appellant's lawful purchase of the firearm. N.T. 8/4/22, 26-29, 159-160; Ex. C-53, C-76.

During its summation, the Commonwealth argued to the jury that it could draw a reasonable inference of Appellant's intent from the timing of the lawful purchase of the firearm, especially in the context of the years' long stalking of the victim. N.T. 8/25/22, 57-59, 82. It explicitly set the firearms evidence within the context of what the Commonwealth had to prove about Appellant's intent and stated clearly that it did not allege the gun was used or a violent act had occurred. *Id*., 59. This was undoubtedly permissible argument. ***Commonwealth v. Smith***, 985 A.2d 886, 907 (Pa. 2009) (a prosecutor is permitted to "vigorously argue his case so long as his comments are supported by the evidence or constitute legitimate inferences arising from that evidence"); ***Commonwealth v. Luster***, 71 A.3d 1029, 1048 (Pa. Super. 2013) (*en banc*) (similar). That this part of the argument covered less than 4 of 31 pages of argument confirms the prosecutor complied with the court's order that she not "overemphasize" the firearms evidence. The strongest and

lengthiest part of the summation in support of the inference of intent was the prosecutor's recounting of the relentlessness of Appellant's conduct in the final months and his lies to police officers about it. *See* N.T. 8/25/22, 71, 73-81.[7]

Accordingly, we hold the trial court did not abuse its discretion by admitting the limited firearms evidence.

Judgment of Sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/17/2024

_____

[7] Appellant also argues that the prosecutor's analogy of stalking to a conspiracy to commit murder charge was improper. Appellant's Brief, 27-28. Appellant misconstrues the argument. The prosecutor was explaining to the jury that the question of Appellant's intent was separate from whether the victim knew about his behavior, which argument was in direct response to Appellant's argument. *See* N.T. 64-66.